IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

FISKARS FINLAND OY AB, and FISKARS
BRANDS INC.,

                    Plaintiffs,

        v.                                              OPINION and ORDER

WOODLAND TOOLS INC., LUMINO, INC.,                      22-cv-540-jdp
ROSS GUNDLACH, VANCE KOCH, and
STEPHANIE COTA,

                    Defendants.

---

This case is a battle between competitors in the hand-held gardening tool market. The plaintiffs are Fiskars Finland Oy Ab and Fiskars Brands Inc., of orange-handled scissors fame. Defendant Woodland Tools, Inc. is the upstart. Fiskars says that Woodland, through an affiliated company, defendant Lumino, Inc., recruited three Fiskars's employees to use Fiskars's designs, trade secrets, and confidential information for a line of copycat tools. Woodland asserts counterclaims against Fiskars for false advertising and tortious interference.

The parties seek summary judgment on virtually all issues. The many claims and counterclaims mostly miss the mark, and the court will dismiss most of them on summary judgment. The one exception is part of Woodland's claim against Fiskars for false advertising, based on Fiskars's statements about the cutting power of its tools, and some of its statements that certain products were designed in the United States.


BACKGROUND

The court will provide a succinct summary of the background facts here, saving the details for the analysis section.

Fiskars designs, manufactures, and sells consumer goods in dozens of countries worldwide. Fiskars's products include gardening and yard tools, for which it owns both design and utility patents. Woodland Tools was founded in 2020 by Michael Kollman and Keegan Nesvacil, a former Fiskars employee. Woodland also makes and sells gardening tools. Both Fiskars and Woodland distribute their products through some of the same brick-and-mortar retailers, such as Blain's Farm and Fleet and Menards. They also use some of the same oversees manufacturers.

Kollman also owns the company Lumino, Inc., which makes and sells window treatments. Fiskars says Lumino is merely an alter ego of Woodland; Woodland denies that, although all agree that Woodland and Lumino share some resources.

Lumino hired several former Fiskars employees, including the three who are individual defendants here. Ross Gundlach left Fiskars and began working at Lumino in April 2021. When Gundlach left Fiskars, he was a category manager, and his job duties included sales analytics and planograms (how products are displayed at retail stores). Gundlach joined Lumino as its director of sales analytics. Stephanie Cota was the global director of business and offering at Fiskars, and she began working as a director at Lumino in February 2022. Vance Koch had worked for Gundlach when Gundlach was at Fiskars. In September 2021, Koch left Fiskars and began working at Lumino.

Koch had worked as a sales analyst at Fiskars since June 2018, shortly after he completed his undergraduate degree. While working at Fiskars, Koch had developed code using the open source programming language Python to automate the downloading and formatting of point-of-sales data from Fiskars's retail distributors. In the weeks before Koch left Fiskars,

he emailed himself the Python code that he had written. Once he was at Lumino, he downloaded it to a Lumino computer.

In spring 2022, Fiskars learned that Woodland products were being sold at some of the same retailers as Fiskars. Some Fiskars employees believed that Woodland sold products similar to those sold by Fiskars. They suspected that the former Fiskars employees working at Woodland were using their knowledge of Fiskars products to create copycat products at Woodland. As part of its investigation of the new competitor, Fiskars discovered that Woodland was using three suppliers in China, Vietnam, and Taiwan that Fiskars also worked with. In July 2022, Fiskars demanded that the suppliers stop manufacturing products for Woodland that competed with the products they made for Fiskars. Fiskars also asked for information about the suppliers' relationships with Woodland.

Fiskars filed this lawsuit in September 2022. In October 2022, Fiskars notified the suppliers about this lawsuit and demanded that they stop manufacturing any products that Fiskars accessed of patent infringement.

ANALYSIS

The factual outline of the dispute is simple enough, but the parties assert many claims against each other. All the parties move for summary judgment on the claims brought against them. The claims fall into two broad categories: (1) those based on the products they sell and advertising claims about them; and (2) those based on specific incidents of misconduct. The main part of the court's opinion takes these categories one at a time.

Summary judgment is appropriate only if there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the court views all

facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment will not be granted unless "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

## A. Product and advertising claims

Fiskars contends that Woodland copied Fiskars's products and made false statements about its products to gain an unfair advantage in the garden tool market. Fiskars originally asserted the infringement of four design patents. It has withdrawn the claims based on two of the patents, Dkt. 64, so two remain. For its part, Woodland asserts false advertising claims based on statements Fiskars makes about its products. The court begins with Fiskars's patent infringement claims, and then turns to the parties' false advertising claims.

### 1. Fiskars's patent claims

Fiskars's U.S. Patent No. D720,969 claims an ornamental design for gardening snips. Fiskars's U.S. Patent No. D684,828 claims an ornamental design for a trimming tool commonly referred to as a "lopper." Fiskars accuses Woodland of infringing both patents, and Woodland moves for summary judgment of noninfringement.

"A design patent only protects the novel, ornamental features of the patented design." *OddzOn Prod., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997). To determine if an accused product infringes a design patent, courts apply the ordinary observer test that the Supreme Court originally set out in *Gorham Company v. White*, 81 U.S. 511 (1871). Under this test, a design patent is infringed when the accused product would appear "so similar to the claimed design that a purchaser familiar with the prior art would be deceived by the similarity

4

between the claimed and accused designs, 'inducing him to purchase one supposing it to be the other.'" *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 683 (Fed. Cir. 2008) (quoting *Gorham*, 81 U.S. at 528). This is a question of fact that Fiskars has the burden of proving. *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010).

The claims of design patents are presented in drawings, because they are not typically well represented by verbal description. *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1320 (Fed. Cir. 2016). Judicial claim construction is not usually necessary. But in cases "[w]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." *OddzOn Prod.*, 122 F.3d at 1405. After the court has determined the scope of the claim, the factfinder compares the design and the accused product "to determine whether the patented design as a whole is substantially similar in appearance to the accused design." *Id.* Then, if "the claimed and accused designs are not plainly dissimilar," the court compares the design and the accused product in light of the relevant prior art. *Egyptian Goddess*, 543 F.3d at 678. For cases in which "the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important to the eye of the hypothetical ordinary observer." *Id.*, at 676. But courts should not focus on specific differences at the expense of missing similarities in the overall appearance. *Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1343 (Fed. Cir. 2020).

### a. Motion to exclude Fiskars's patent infringement expert

There's a preliminary matter. Fiskars relies on an expert, Steven C. Visser, to support its contention that Woodland's accused products infringe its design patents. Woodland moves to exclude Visser's opinions and testimony. Woodland does not challenge Visser's

qualifications, but it contends that his opinions are unreliable and misleading for several reasons.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993) and *Kumho Tire Company, Ltd., v. Carmichael*, 526 U.S. 137, 147 (1999), the court must ensure that proffered expert testimony meets the requirements of Rule 702. For testimony to be admissible under Rule 702, the individual proffering the testimony must be qualified as an expert, the expert's opinions must be based on reliable methods, and those methods must be reliably applied to the facts of the case.

Visser uses what he describes as a three-part method to analyze the asserted design, the accused product, and the prior art. He contends that three aspects of a product design are particularly significant in a consumer's identification of a product: silhouette, edges, and surface contour. So he begins his analytical process by transforming images of the design and the accused product into three versions, one showing only silhouette, one adding the edges, and one showing surface contour. His infringement analysis is then based on the assessment of the transformed versions.

Woodland objects that Visser's three-part method deviates from the *Egyptian Goddess* standard, which requires direct comparison of the patented design with the accuses product as a whole from the perspective of the ordinary observer. Visser's three-part analysis, according to Woodland, improperly isolates parts of the design rather than focusing on the whole.

Visser's three-part analysis does not have a robust pedigree. It's based on his own presentations about product design, which he derived in part from research by cognitive scientists in the field of perception. But the method has enough of a grounding in science and common sense to give it plausible reliability. Nothing in *Egyptian Goddess* prohibits an expert,

the court, or the factfinder, from looking at the parts of the design as part of the assessment of the overall effect. So the court won't exclude Visser's report because he used his three-part method to highlight certain aspects of the designs and accused products.

But Visser's work has three fundamental problems.

First, Visser misapplies the *Egyptian Goddess* approach to the prior art. Under *Egyptian Goddess*, if the patented design and the accused product are not plainly dissimilar, the analysis requires a three-way comparison of the patented design and the accused product in light of the prior art. In Visser's report, he selects what he deems to be the closest single piece of prior art, and then focuses on the differences between the patented design and that piece of prior art. But *Egyptian Goddess* contemplates that the prior art is likely to be a set of references. 543 F.3d at 677 ("Where the frame of reference consists of numerous similar prior art designs, those designs can highlight the distinctions between the claimed design and the accused design as viewed by the ordinary observer."). Visser's single-piece approach systematically understates the similarity of the patented design to the prior art, thereby improperly broadening the scope of protection for the patented design.

Second, Visser misstates the law concerning functionality. Visser says that a feature of a design is functional only if there is only one way to serve that function. The "only one way" doctrine applies to the patentability of a design. One may not secure design patent protection for a design dictated by function. "Design patents on such primarily functional rather than ornamental designs are invalid." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1328 (Fed. Cir. 2015). But when a design includes both functional and ornamental aspects, the court must construe the claim to exclude the functional aspects. Visser makes no effort to exclude any functional aspects in the two patents in his infringement analysis.

Third, despite Visser's invocation of his three-part method, his report is ultimately merely conclusory and unhelpful to the jury. An expert must provide more than just a bare conclusion. *See, e.g., Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."); *Zamecnik v. Indian Prairie School Dist. No. 204*, 636 F.3d 874, 881 (7th Cir. 2011) ("Mere conclusions, without a hint of an inferential process, are useless to the court.") (citation and quotation marks omitted).

In a design patent case, the factfinder must compare the design patent to the accused product in light of the prior art, to determine if the overall appearance of the accused product is substantially the same as the patented design, so that a purchaser would be deceived into purchasing the accused product mistaking it for the patented one. *Egyptian Goddess*, 543 F.3d at 670. Visser's report uses his three-part process of identifying the silhouette, edges, and surface contours of the relevant images to assess the similarity. The bulk of his report comprises images of the silhouettes, edges, and surfaces of the design patents, accused products, and prior art from different perspectives for side-by-side comparison. But Visser does not explain how the images he generated to compare these three aspects actually relate to his conclusion that Woodland's products infringe Fiskars's design patents.

Visser identifies several ways in which Fiskars's design patents differ from the selected piece of prior art. Drawing a point from *Egyptian Goddess*, he says that the ordinary observer would accord the differences between the prior art and the patented design with greater significance. Then he provides his conclusions, nearly identical for the two patents:

> It is my opinion that the accused Woodland Tools Snip's overall appearance is closer to the '969 patented design that to the prior art. Although not identical, many of the features that the '969 patent departed from the closest prior art are embodied in the

accused product. . . I have found that the designs are substantially the same so that the ordinary observer, aware of the prior art, could be deceived into purchasing the Woodland Snips thinking it is the patented design.

. . .

It is my opinion that the accused Woodland Tools Lopper's overall appearance is closer to the '828 patented design than is the prior art (the '441 Patent). Many of the features that the '828 Patent departed from the closest prior art are embodied in the accused product. . . I have found that the designs are substantially the same so that the ordinary observer, aware of the prior art, could be deceived into purchasing the Woodland Tools Loppers thinking it is the patented design.

Dkt. 90, at 52, 80. But Visser doesn't explain how the highlighted similarities add up to an overall impression of deceptive similarity. His conclusion doesn't help the factfinder to make sense of the catalog of differences, and the differences are ones a lay juror could identify without Visser's guidance.

Visser's analysis is fatally flawed because he limited his consideration of the prior art to a single piece, he did not consider the functional aspects of the design and accuse products, and his ultimate opinion is merely conclusory, not connected to his analysis, and therefore unhelpful to the jury. The court will grant Woodland's motion to exclude Visser's opinions and testimony.

**b. '969 design patent**

Fiskars's D720,969 patent claims an "ornamental design for a cutting tool." The description of the tool comprises seven drawings of the tool from different views, which are shown below:



Woodland asks the court to construe the '969 patent to exclude the functional features of the design. It proposes that the functional features are:

> two opposing handles:
>
> (a)  configured to accommodate gripping of the handles by a hand,
>
> (b)  connected at a circular joint about which the handles may pivot, and
>
> (c)  extending generally parallel from the joint to handle ends which curve outwardly to serve as grip stops/guides.

Dkt. 163, at 10. Fiskars contends that no claim construction is necessary because a jury could readily understand the distinction between the functional and ornamental features of the design.

The court agrees with Woodland that because the design includes functional features, it is appropriate for the court to exclude those features from the claimed design. The Woodland

proposal is not far off. The functional features include a pair of handles configured to be gripped by the hand, connected with a pivot mechanism at the end, so that the handles may operate the blades at the other end. Some form of stop at the end of the handles is functional, but that function doesn't dictate the shape of the stop (so it need not curve up as Woodland proposes). Because the tool is to be gripped by the hand, it is functional to avoid sharp edges in the grip area. The shape of the handles and the pivot mechanism are, essentially, the ornamental components of the design.

With that construction in mind, the court turns to Woodand's contention that no reasonable jury could find that its snips infringe the '969 patent. The following images show photographs of the accused snips in a side-by-side comparison to the claimed design:



FIG. 1

FIG. 2



FIG. 4   FIG. 5

FIG. 6

FIG. 7

The accused tool and the design are similar in overall layout, but that's functional. The prior art includes examples of trimmers with handles and pivots comprised of generally curvilinear shapes, so that general similarity is insufficient to establish deceptive similarity. Against the background of the prior art, or even in direct side-by-side comparison, there is a striking dissimilarity between the '969 design and the accused product. In the '969 design, the convexly curving handles connect in one smooth arc with the pivot, which is the same width as the handles. The whole design comprises smoothly integrated curves, simplifying the overall shape into a minimalist design that reduces the number of curves and transitions. In contrast, the accused product has distinct components. The grip portion of the handles have a concave curve, turning away from the pivot. This curve thus requires a separate short portion to connect the handle to the pivot. (Best seen in comparison with Figure 2.) The pivot itself is wider than the handles, which makes the pivot stand apart as a separate component. (Best seen in comparison to Figure 4.) The handles of the accused product vary in thickness as they transition from one part to the other, but the handles in the'969 design are of one uniform

12

thickness. No catalog of isolated similarities could overcome the striking differences in overall appearance.

The court concludes that no reasonable jury could find that a hypothetical ordinary observer, familiar with the prior art, could find the accused product is substantially similar to the design claimed by the '969 patent. The court will grant summary judgment to Woodland on Fiskars's claim for infringement of the '969 patent.

### c. '828 design patent

Fiskars's D684,828 patent claims an "ornamental design for a cutting tool," commonly referred to as a "lopper." The description of the tool comprises two embodiments, a short-handled one and a long-handled one, each of which are described with seven drawings:



13



Claim construction of the '828 design is more complicated than for the '969 design because the '828 design does not exclude the cutting apparatus from the claim. Woodland contends that the components of the cutting apparatus are largely functional. Fiskars contends that none of the components of the cutting apparatus are functional because none of them are strictly required for a lopper to function. Fiskars points out that there are loppers without gears, linkages, or dogleg-shaped handles. And even among the loppers that have these things, the size and shape of these components are not dictated by function. According to Fiskars, anything that is not strictly dictated by function is ornamental, and thus properly claimed in a design patent.

Fiskars takes a simplistic and cramped view of functionality. The designer of a lopper has many options to improve the functionality of the device. But just because no single option

14

is strictly required does not mean that the choice to use one of the options creates a non-functional, ornamental element. For example, the use of gears increases cutting force. The size and shape of the gears are driven primarily by functional considerations, such as the mechanical advantage to be gained, the strength and durability of the gearing, and the costs of engineering and production. Fiskars owns a utility patent on a geared lopper that explains such functional considerations. U.S. Patent 5,689,888. Having secured utility patent protection for this technology, Fiskars's assertion here that the cutting apparatus has elements that are highly ornamental rings hollow. Ultimately, Fiskars has not pointed to any element of the cutting apparatus in the '828 design that is actually ornamental.

The court is persuaded that it is appropriate to construe the claimed design as excluding the functional components of the cutting apparatus. Woodland proposes a construction that sets out these elements in detail. Dkt. 163, at 10. Such a detailed construction is unnecessary for the purposes of this decision. The court will construe the '828 design to claim an ornamental design of a cutting tool as shown, excluding the functional elements of the basic layout of tool (two longer handles configured to be drawn together by hand, connected at a pivot so as to bring two shorter blades together) and the gear-driven cutting apparatus.

With that construction in mind, the court turns to the side-by-side comparison of the claimed design and Woodland's accused loppers. Both are shown below:

FIGURE 1





FIGURE 2      FIGURE 3





FIGURE 4   FIGURE 5

FIGURE 6   FIGURE 7

The cutting apparatus is, as discussed above, predominantly functional. And similar geared cutting apparatuses are common in the prior art, as Woodland shows. Dkt. 163, at 24. The significance of the cutting apparatus in the overall design is therefore diminished. *ABC Corp. I v. P'ship & Unincorporated Associations Identified on Schedule "A"*, 52 F.4th 934, 942 (Fed. Cir. 2022). The handles are the dominant ornamental feature of the claimed design. The handles present as a full-length covering of the underlying structure of the handle. The top half of the handle covering is of slightly smaller diameter than the bottom half. Diagonal trim bands cover the top of the handle covering, the transition to the bottom section, and the bottom end

17

of the covering. The bottom section also has an accented area, in the place where the user would grip the tool. The accused product has a very different overall appearance. The handle covering leaves more than half the underlying structure exposed, like a traditional slip-on handle covering. The transition from the cutting mechanism to the tubular metal handle is covered by a separate collar, not present in the '828 design. The bottom of the handles of the accused device terminate in loops (presumably for hanging the tool), not a trim band as in the '828 design. The handles of the accused device also have an accented area in the place where the user would grip the tool. But this isolated similarity is a mere detail in the light of the starkly different design of the handles.

No reasonable jury could find that a hypothetical ordinary observer familiar with the prior art would find the accused loppers substantially similar to the '828 patent design. The court will grant summary judgment in favor of Woodland on Fiskars's claim for infringement of the '828 patent.

## 2. False advertising claims

Both Fiskars and Woodland bring false advertising claims under the Lanham Act. To prove a false advertising claim, the party brining the claim must establish the following elements:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product;
>
> (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience;
>
> (3) the deception is material, in that it is likely to influence the purchasing decision;
>
> (4) the defendant caused its false statement to enter interstate commerce; and

18

> (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999).

### a. Fiskars's claim against Woodland

Fiskars contends that Woodland engaged in false advertising in violation of the Lanham Act when it described its Regular Duty Bypass Pruner as "designed in the USA." Fiskars's complaint specifically identifies the following statements on Woodland's website as false: that Woodland's products are "designed right here in the US" and that all its products "are designed in the USA." Dkt. 33, at ¶¶ 85–86. Fiskars alleges in its complaint that Woodland copied Fiskars's version of the tool—which would mean that Woodland did not design its tools at all—so Woodland's statement that Woodland designed its tools in the United States is false. Dkt. 33, at ¶¶ 85–98, 196–98.

In its opposition to Woodland's motion for summary judgment, Fiskars contends that the statement is false for a different reason: because Woodland has admitted that some parts of its tools are not designed in the United States. To support this contention, Fiskars cites Woodland marketing materials for retailers that say "100% designed in the USA" and deposition testimony in which Kollman and Nesvacil say that part of every Woodland product is designed in the United States but not necessarily 100 percent of the design of every product. Dkt. 130 (Nesvacil Dep. 212:16–213:24); Dkt. 137 (Kollman Dep. 186:17–20); Dkt. 167-34, at 7; Dkt. 216-10, at 8; Dkt. 216-32, at 10. "One hundred percent designed in the USA" is not the statement that Fiskars identified as false advertising or the theory of falsity than Fiskars alleged in its complaint. *Compare* Dkt. 33, ¶¶ 94–95 ("Despite this, Woodland Tools touts on its website that '[e]very Woodland Tool is designed right here in the US.' Woodland Tools'

19

statement is false since these tools were designed by entities other than Woodland Tools."),
*with* Dkt. 219, at 40 ("even if Woodland Tools did design <u>*most*</u> aspects of its products in the
United States, the fact remains Woodland Tools products were <u>***not***</u> '100% designed in the
USA' as advertised in promotional materials to some of the country's largest retailers").

A plaintiff may not amend its claims by advancing new arguments in opposition to
summary judgment, so the court will not consider Fiskars's assertion of a claim based on
Woodland's "100% designed in the USA" statement.

As for the statements that Fiskars identifies in its complaint, the court concludes that
the first element of the Lanham Act, falsity, is dispositive here. A statement is actionable under
the Lanham Act if it is literally false. *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 382 (7th
Cir. 2018) (citing *Hot Wax, Inc.*, 191 F.3d at 820). A literally true but misleading statement or
an ambiguous statement can also be actionable under the Lanham Act. But to press such a
claim, a plaintiff typically needs to produce evidence of actual consumer confusion "to show
that the challenged statement has 'the tendency to deceive a substantial segment of its
audience.'" *Id.* (citing *Hot Wax, Inc.*, 191 F.3d at 820). Fiskars's opposition brief does not make
clear whether it is relying solely on a theory of literal falsity. But Fiskars does not present any
evidence of consumer confusion, which it would need to prove its claim under a theory that
the statements are ambiguous or literally true but misleading. This means that Fiskars needs
to provide evidence that Woodland's statement "on its face conflicts with reality." *Eli Lilly &
Co.*, 893 F.3d at 382.

Fiskars fails to offer such evidence. As discussed above, Fiskars's opposition brief focuses
on whether every part of every Woodland tool was designed in the United States. But Fiskars
does not present evidence from which a reasonable jury could find that Woodland's tools were

not designed in the United States because Woodland copied its products instead of designing them. Woodand's founders testified that they designed at least some part of every Woodland product in the United States, and Fiskars does not offer any evidence to contest that testimony. Because Fiskars has failed to provide evidence to support its assertion that Woodland's "designed in the United States" claim is literally false, the court will grant summary judgment to Woodland on Fiskars's false advertising claim.

**b. Woodland's claims against Fiskars**

Woodland contends that three types of statements that Fiskars makes about its products are false advertisements in violation of the Lanham Act: (1) statements that certain Fiskars products will cut three times easier or with up to three times more power; (2) statements that its products are designed in the United States; and (3) statements about certain Fiskars products having a titanium blade coating.

Woodland's false advertising claims presents two threshold issues.

**i. Woodland's right to sue and the remedies available**

Fiskars contends that Woodland does not have a statutory right to bring any false advertising claims prior to January 2022, because it could not have suffered any injury from the alleged false advertising before its entry into the market. To support this contention, Fiskars cites the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.* in which the Court considered whether the plaintiff had could bring a claim under the Lanham Act and "h[e]ld that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." 572 U.S. 118, 133 (2014).

21

But *Lexmark* presented a markedly different procedural and factual situation than this case. *Lexmark* involved a motion to dismiss a Lanham Act claim based on the contention that the party bringing the claim did not directly compete with Lexmark, the company allegedly committing false advertising. Instead, the party bringing the Lanham Act claim was a supplier who sold products to Lexmark's direct competitors, and Lexmark successfully argued that the supplier was not given the right to sue under the statute because it was not Lexmark's direct competitor.

Here, there is no dispute that Woodland is a direct competitor "within the zone of interests protected by the statute" whose alleged harm of delayed entry into the market has "a sufficiently close connection to the conduct that statute prohibits" to satisfy the proximate cause requirement for standing. *Id.*, at 133, 137. Thus, Woodland has the right to bring claim against Fiskars for false advertising under the Lanham Act. Woodland will need to prove that it "has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products" to succeed on its false advertising claim. *Hot Wax, Inc.*, 191 F.3d at 819. It is common sense that Woodland cannot have been injured (or have been likely to be injured) before it existed as a company, so it will need to provide evidence from after that point to prove this element of its claim. But Woodland's ability to prove that it has been injured by Fiskars's alleged false advertisements is a different question than the scope of damages Woodland can seek to address that injury.

This leads to another damages question. Even though the parties have not completed damages discovery, Woodland asserts that it will seek an equitable remedy of disgorgement of profits. Dkt. 205, at 70; Dkt. 271, at 6. Under 15 U.S.C. § 1117, a plaintiff who establishes

that the defendant violated the false advertising provision of the Lanham Act is entitled to recover the defendant's profits, subject to the principles of equity. Courts have "wide discretion to fashion an appropriate remedy," including ordering the disgorgement of profits "to serve as a proxy for damages, or to deter the wrongdoer from continuing his violations." *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1092, 1096 (7th Cir. 1994). Disgorgement of profits may create a windfall for the plaintiff bringing the Lanham Act claim that awards more than the plaintiff's actual damages if such an award is necessary "to deter further violations to protect the public at large." *Id.*, at 1096. The fact that Woodland's actual injury is limited to after it was founded will be a factor in any assessment of an equitable award based on Fiskars's profits after the parties have provided evidence of damages. But the court will not prematurely limit the scope of Woodland's claims to false advertisements made after January 2022.

### ii.    Motion to strike declaration of Daniel Cunningham

A second threshold issue concerns Fiskars's summary judgment evidence.

Fiskars's Principal Front End Engineer, Daniel Cunningham, provided declaration testimony with certain details about Fiskars's tools as evidence that its statements are literally true. Dkt. 166. In his declaration, Cunningham (1) asserts that all of Fiskars products that say "Titanium Blade Coating" on the packaging actually contain titanium in the blade coating, (2) provides testing results and asserts that they support Fiskars's statement about the cutting power of Fiskars's tools, and (3) asserts that all of the Fiskars's products at issue in Woodland's false advertising claim were designed or redesigned in the United States. Woodland contends that the court should strike Cunningham's declaration because it is untimely, undisclosed

expert testimony.[1] Cunningham was never identified as an expert in this case, so any expert testimony in his declaration would be untimely. The issue is whether the Cunningham declaration contains expert opinions.

Under Federal Rule of Evidence Rule 602, a lay witness must have personal knowledge of something to testify about it. And under Rule 701, a lay witness may not provide opinion testimony that is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." "Testimony based solely on a person's special training or experience is properly classified as expert testimony." *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan Int'l, Inc.*, 533 F.3d 555, 561 (7th Cir. 2008). But a lay witness's testimony based on his personal knowledge of a specialized subject matter is not necessarily within the scope of Rule 702. *Id.*, at 560 (citing advisory committee notes to Fed. R. Evid. 701). Cunningham is an engineer with more than a decade of experience at Fiskars. His declaration is a mix of statements based on his personal knowledge and testimony based on specialized knowledge and training that falls within the scope of Rule 702.

As for the portion of Cunningham's declaration that concerns the titanium blade coating on Fiskars's products, *see* Dkt. 166, at ¶¶ 7–8, whether Fiskars's blade coatings contain titanium is the type of technical information that Cunningham would have personal knowledge of after working as an engineer at Fiskars. Woodland appears to recognize that paragraphs

---

[1] Fiskars asks the court to reserve ruling on Woodland's motion until the parties depose Cunningham. The court will deny this request. Fiskars relies on Cunningham's declaration to move for summary judgment, which puts its admissibility at issue for purposes of deciding Fiskars's motion. And whether Cunningham's declaration qualifies as expert testimony is a question of law that depends on the information in the declaration, not subsequent explanations from Cunningham about it.

seven and eight of his declaration do not qualify as expert testimony. *See* Dkt. 194, at 1 ("At least paras. 9–17 of the Cunningham Declaration are untimely expert testimony"); Dkt. 230, at 5 ("The Court should grant Woodland's motion, striking paragraphs 9-17 of Cunningham's declaration"). The court concludes that Cunningham's statements about the titanium coating on Fiskars's products are not within the scope of Rule 702, so it will not strike paragraphs seven and eight from Cunningham's declaration.

As for the portion of Cunningham's declaration that concerns the cutting power of Fiskars's products, *see* Dkt. 166, at ¶¶ 9–17, Cunningham provides information based on specialized knowledge and experience as an engineer. Almost half of Cunningham's declaration is an explanation of why certain Fiskars products have a "2x/3x claim on the packaging," including discussion of the effects of certain product features and citation to results from testing Fiskars's tools in comparison to other products. The testing results that Cunningham cites contain technical data that requires specialized knowledge to understand and interpret. *See* Dkt. 166-1; Dkt. 166-2; Dkt. 166-3. Cunningham's explanation of the effects of certain product features is the type of information that any expert in physics or mechanical engineering would provide as context to help the factfinder understand the testing results. Fiskars contends that Cunningham's statements about the testing results are "lay conclusions based on work-related information using simple calculations" similar to statements that other courts in the Seventh Circuit have found to be admissible lay witness testimony. *See* Dkt. 228, at 1–2 (citing *Smith v. Illinois Ass'n of Sch. Bd.*, No. 3-10-CV-00242, 2012 WL 895426, at *4 (S.D. Ill. Mar. 15, 2012) and *Navarrete v. Madison Cnty.*, No. 17-CV-347, 2021 WL 2374350, at *2 (S.D. Ill. June 10, 2021)). But Cunningham's opinions are not the type of simple mathematical calculations of lost wages or property valuation that were at issue in the cases Fiskars cites. The

court concludes that paragraphs 9 through 17 of Cunningham's declaration are within the scope of expert testimony as defined by Rule 702.

As for the portion of Cunningham's declaration that concerns where Fiskars's products were designed, *see* Dkt. 166, at ¶¶ 18–19, Cunningham's statements are not based on specialized knowledge. So, the court concludes that paragraphs 18 and 19 do not need to be excluded as expert testimony under Rule 702.

The court will grant Woodland's motion to strike paragraphs 9 to 17 of Cunningham's declaration and will exclude any related testimony from Cunningham.

### iii.   Woodland's false advertising claim concerning cutting power statements

Fiskars advertises some of its products as having "up to 3x more cutting power." Dkt. 235, ¶¶ 396–97. Woodland contends that this statement and similar "2x" or "3x" power-based claims are ambiguous and misleading to consumers because the advertisements do not identify what other tools Fiskars's tools are more powerful than. Fiskars contends that its "up to 3x more cutting power" statement is true and that, even if the statement is ambiguous, Woodland has not provided admissible evidence that that specific phrase causes consumer confusion.

Fiskars's cutting power advertisements with open ended statements about "more power" are ambiguous. The counterclaim identifies 13 products in its claim about cutting power that have similar statements, which include "Cuts 3X easier," "3X more cutting power," "3X more power," and "2X more power." Dkt. 37, at 61–89 (Counterclaims ¶¶ 37, 88–89, 94–96, 102–04, 110–13, 119–21, 125–26, 131–32, 137, 142, 147–48, 154–55, 161–62). An example of one of the variations of these statements on the packaging of the Fiskars's 9286 hedge shears,

which simply states "up to 3x more cutting power." Dkt. 208-26.[2]   A person reading the statement that a tool has "up to 3X more cutting power" must speculate about what baseline the word "more" is comparing the tool to. Fiskars contends that the phrase clearly refers to a comparison between the double geared tools and single pivot tools, which is included in the full description on Fiskars's website for at least two of the products at issue. Dkt. 236, at 30 (citing Dkt. 37, at ¶¶ 149, 156). But there is no genuine dispute that the packaging on Fiskars's in-store products does not specify that the power comparison is to single pivot tools. And without the additional context that Fiskars includes on its website, the cutting-power statements are ambiguous.

Woodland has the burden of providing evidence of consumer confusion to establish that these ambiguous statements actually deceive or have a tendency to deceive a substantial segment of the audience. Whether an advertisement has the tendency to deceive consumers is a question of fact that depends on "how real consumers understand and react to the advertising." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 476 (7th Cir. 2020).   Woodland relies on expert reports from Dr. Stephen Nowlis, a professor of marketing, as evidence of consumer confusion. Nowlis conducted a survey to assess how consumers interpreted the phrase "up to 3X more power." Nowlis concluded that when compared to a control statement

---

[2] Fiskars contends that Woodland failed to provide admissible evidence to show that Fiskars caused the alleged false cutting-power statements to enter interstate commerce because Woodland relies on undated photographs from its counterclaim and a document showing the label from Fiskars's hedge shears, but not the actual product. But Woodland provided a declaration from Nesvacil to authenticate the photographs it relies on. *See* Dkt. 37 ¶ 111; Dkt. 214, ¶ 27. And Fiskars does not argue that the label Woodland cites was not actually used in the packaging of its products or that it does not make the cutting power claims at issue, so Woodland has provided evidence that Fiskars caused the cutting-power statements to enter interstate commerce.

that said, "more power than non-geared tools," an additional 20.1 percent of respondents interpreted the phrase to mean that the advertised tool has up to 3X more cutting power than earlier versions of Fiskars's product or other competitive products on the market. Fiskars implicitly concedes that its cutting-power statements do not apply to all competitive products when it argues that the statements are unambiguous because its "advertising related to more cutting ability is a comparison of Fiskars's tool innovations to <u>single pivot</u> tools." Dkt. 236, at 29 (emphasis in original). The court concludes that a reasonable jury could credit Nowlis's analysis and conclude that Woodland has established that the cutting-power statements have a tendency to deceive consumers.

Fiskars does not challenge the admissibility of Nowlis's report, but it contends that the report is insufficient to establish evidence of consumer confusion for all the products at issue in Woodland's claim concerning cutting power.[3] Specifically, Fiskars contends that Nowlis's consumer survey is only relevant to the specific language Nowlis used in the survey, "up to 3X more power," and cannot be used to establish consumer confusion about any of the similar phrases that Fiskars uses to advertise other products, including "cuts 3X easier" and "3X more cutting power." But Fiskars does not cite any authority to support its contention that Nowlis's report is only relevant to the claims based on the exact language used in Nowlis's survey. A reasonable jury could infer from Nowlis's report and the context of Fiskars's advertisements that the similar statements mislead consumers in the same way as the statement Nowlis tested.

---

[3] In its reply brief, Fiskars contends for the first time that Woodland failed to establish that the advertisements concerning cutting power are material to consumers. But Fiskars did not raise this argument in its opening brief in support of summary judgment, so it has forfeited its argument for summary judgment based on this element of Woodland's false advertising claim.

The court will deny Fiskars's motion for summary judgment on Woodland's false advertising claim based on Fiskars's cutting-power statements.

### iv. Woodland's false advertising claim concerning designed in United States statements

Woodland contends that Fiskars falsely advertises certain products with packaging stating that the products are "designed in the United States." The specific products at issue are Fiskars's 9117 pruners, 9109 pruners, 9688 pruners, 7936 pruners, 9189 hedge shears, and 9286 hedge shears.[4] Woodland's theory is that these statements are literally false because Fiskars designed the products in countries other than the United States. Fiskars contends that the statements are true and that the statements cannot be literally false because the term "designed" is ambiguous.[5] The relevant evidence about the place of design varies among the specific tools at issue so the court will address each in turn.

As for the 9117 pruners, Fiskars has admitted that the tool was designed in Finland and not the United States. Dkt. 208-25. This means that the only issue in dispute for the falsity element for the 9117 pruners is whether the phrase cannot be literally false because the phrase is ambiguous. Fiskars contends that the statement is ambiguous because "'design' is an all-encompassing term that can be interpreted multiple ways." Dkt. 169, at 31 (citing the legal

---

[4] Woodland's counterclaim also includes Fiskars's 9132 lopper in the list of products for this claim, but Woodland does not address the 9132 lopper in its opposition to Fiskars's motion for summary judgment, so Woodland appears to have abandoned its claim about this product. The court will grant summary judgment to Fiskars on this claim.

[5] In its reply brief, Fiskars contends that Woodland has failed to provide admissible evidence that Fiskars made the alleged false statements at issue. Dkt. 236, at 26–28, 39. But Fiskars responded to requests for admission from Woodland by admitting that "some of the product packaging for the [products at issue] states DESIGNED BY FISKARS IN THE USA.'" Dkt. 208-25, at 15–19. These admissions establish that Fiskars made the alleged false design origin statements. Fed. R. Civ. P. 36(b).

definition of the noun "design"). But Fiskars does not actually identify multiple reasonable interpretations of the statement.

The meaning of the verb "design" in the phrase "designed in the USA" is not ambiguous. In the context of manufacturing a product, design means to "decide upon the look and functioning of (a building, garment, or other object), typically by making a detailed drawing or it." New Oxford American Dictionary (2d ed. 2005); *see also Design*, Webster's Third New International Dictionary of the English Language Unabridged (1971) ("to plan and plot out the shape and disposition of the parts and structure constituents of"). The act of designing a product could refer to making decisions about a broad range of features of a product, but what it means to design a product is not reasonably understood as conveying multiple interpretations. Fiskars's admission that the 9117 pruner was designed in Finland establishes the falsity element of Woodland's false advertising claim for this product, and Fiskars does not move for summary judgment based on any other element of Woodland's false advertising claim.[6] So the court will deny Fiskars's motion for summary judgment on Woodland's false advertising claim concerning the 9117 pruners.

As for the 9109 pruners and the 9688 pruners, Woodland relies on allegations in Fiskars's original complaint in this case as evidence that the tools were designed in Finland and China, respectively. Dkt. 1, ¶¶ 95–96. After Woodland brought its counterclaim concerning Fiskars's design origin statements, Fiskars removed those statements when it amended its complaint and responded to Woodland's requests for admission by denying that the 9109

---

[6] In its reply brief, Fiskars contends that Woodland has not offered any evidence that the design origin statements are material to consumers. Dkt. 236, at 40. But Fiskars did not raise the issue of materiality in its opening brief, so it has forfeited its challenge to this element on summary judgment.

pruners were designed outside the United States and asserting that "some aspects of the Fiskars 9688 Pruners were designed in the United States." Dkt. 208-25, at 6. Fiskars also relies on the declaration Cunningham provided on its behalf, in which he says that the 9109 pruners and 9688 pruners "were either originally designed in the U.S. and/or redesigned by Fiskars Brands in the U.S. to adapt the product for new manufacturing techniques and ultimate sale in the U.S. market." Dkt. 166, ¶ 18.

Even though Fiskars's original complaint is no longer the operative pleading in this case, the statements that Fiskars made about its own products in the original complaint fit the definition of out-of-court statements excluded from the definition of hearsay. *See* Fed. R. Evid. 801(d)(2). By filing the original complaint, Fiskars's attorney, acting as its representative, certified that "to the best of the [attorney]'s knowledge, information, and belief" the factual contentions in the complaint had evidentiary support. Fed. R. Civ. P. 11(b). Thus, the factual contentions in the original complaint about where Fiskars's products were designed qualify as statements "made by a person whom [Fiskars] authorized to make a statement on the subject" and are relevant to what Fiskars believed about where its products were designed. Fed. R. Evid. 801(d)(2)(C). The factual allegations about where the 9109 pruners and the 9688 pruners were designed in the original complaint directly conflict with the factual assertions that it made later in the case. This creates a genuine dispute about where these two products were designed, so the court cannot grant summary judgment in Fiskars's favor on Woodland's counterclaim about these two products.

As for the 7936 pruners and 9189 hedge shears, Fiskars admits that the versions of those tools that it sold before 2012 were designed in Finland but asserts that after 2012 they were designed in the United States. Dkt. 208-25, at 8–10. Cunningham asserts that the 7936

pruners and 9189 hedge shears were originally designed or subsequently redesigned in the United States, which Fiskars contends demonstrates that its design origin statement is true. Dkt. 166, ¶ 18. But James Meiller, who worked at Fiskars as a Senior Design Engineer and then a Senior Manufacturing Engineer from August 2011 to May 2020, asserts that he was not aware of any design changes or redesigns of the 7936 pruners or the 9189 hedge shears during his employment at Fiskars. Dkt. 213, ¶¶ 5–6. These dueling declarations from Meiller and Cunningham create a genuine dispute of fact that precludes summary judgment on Woodland's claim concerning these two products.

As for the 9286 hedge shears, the sole piece of evidence that Woodland cites to show that the shears were not designed in the United States is a utility patent that is listed on the product packaging as covering the product. *See* Dkt. 208-26; Dkt. 208-27. Woodland contends that the shears cannot have been designed in the United States because the inventors and assignee listed on the patent are all located in Finland. But the location of an inventor or assignee of a patent does not necessarily dictate where the commercial embodiments of the patent are designed. And Woodland does not offer any evidence to dispute Cunningham's assertion that he personally designed the 9286 hedge shears in the United States. *See* Dkt. 166, ¶ 19. Because Woodland has failed to provide any evidence from which a reasonable jury could conclude that the designed origin statement on the 9286 hedge shears is literally false, the court will grant summary judgment in favor of Fiskars on Woodland's claim concerning this product.

32

> **v.    Woodland's false advertising claim concerning titanium blade coating statements**

Fiskars advertises seven of its products as having a titanium blade coating. The parties agree that Woodland's blade coating testing showed that the products at issue in this claim had less than seven percent titanium in the coating. Dkt. 235, ¶ 457. Woodland contends that this testing shows that Fiskars's statement is literally false because the coating on those products is not 100 percent titanium. Woodland also contends that Fiskars's statement about the blade coating is literally false because there was a period in which one of Fiskars suppliers could not produce titanium coating.

To support its first contention, Woodland argues that "titanium blade coating" unambiguously means the coating is composed entirely of titanium. But the phrase "titanium blade coating" does not have only one reasonable interpretation. It could plausibly mean either that the coating is made entirely of titanium or that the coating contains some amount of titanium, mixed with other compounds that make up the coating. The actual coating on Fiskars products is squarely within the second possible meaning because it has detectable amounts of titanium. Woodland relies solely on its literal-falsity theory and does not present any evidence of consumer confusion, which it would need to do to succeed on a claim that the phrase is false because it is misleading. So, Woodland has failed to provide evidence that would allow a reasonable jury to conclude that Fiskars's statements about the blade coatings on its products are false.

As for Woodland's second contention, Woodland relies on testimony from Nesvacil that, when Woodland was working with the supplier United Jumbo to develop its own products, United Jumbo said that it could not make a titanium blade coating. Woodland argues

that this means that there could not be any titanium in the tools that United Jumbo produced for Fiskars in that period, which would make the claim that its tools had a titanium blade coating literally false under any meaning of the phrase. This argument is too speculative to create a genuine dispute of material fact about whether Fiskars's statement was literally false. Woodland does not identify the specific period in which United Jumbo was purportedly unable to manufacture titanium blade coatings and does not offer any evidence to identify which, if any, of Fiskars's seven titanium blade coating tools were produced by United Jumbo that would have been devoid of any titanium for that unspecified period.

The court concludes that Woodland has not provided evidence from which a reasonable jury could conclude that Fiskars's statements about its titanium blade coatings were false and will grant summary judgment in favor of Fiskars on this claim.[7]

## B. Conduct-related claims

The court now turns to the parties' claims concerning alleged misconduct toward its competitor. Fiskars brings these claims: misappropriation of trade secrets claims against Woodland, Lumino, and Koch; common law claims against each of the individual defendants related to their alleged misuse of Fiskars's confidential information; and a tortious interference claim against Woodland and Lumino related to its allegations that they conspired with the other defendants to steal Fiskars's trade secrets and confidential information. Woodland brings its own tortious interference claim concerning Fiskars's communications with Woodland's suppliers. All parties move for summary judgment on the claims against them.

---

[7] Because the court will grant summary judgment to Fiskars on Woodland's false advertising claim concerning Fiskars's blade coating statements, the court does not address the parties' dispute concerning Fiskars's unclean hands defense based on these statements.

Again, the court begins with a threshold issue: Woodland's motion to exclude expert opinions and testimony that Fiskars provided in support of its claims for misappropriation of trade secrets and breach of confidentiality.

### 1.  Motion to exclude opinions from Fiskars's expert Mark Gianturco

Fiskars retained Mark Gianturco to provide expert testimony concerning its trade secret misappropriation claim and its breach of confidentiality claim against Stephanie Cota. Gianturco has a Ph.D. in Information Technology and experience in the software engineering field. In his expert report, Gianturco provides a general overview of programming languages and opines that the Python code that Koch sent himself is valuable and was protected by Fiskars and that in his experience the timing and manner of Koch sending himself the documents "provides consistent evidence of an attempt to misappropriate IP." Dkt. 82-3, at 17. Woodland contends that Gianturco is not qualified to offer opinions about Koch's behavior and that none of his opinions reliably apply principles and methods of software engineering to the facts of this case.[8] The court will first address Gianturco's opinions about Koch's conduct, then address his opinions related to the alleged trade secrets, and then address his explanation of general software concepts.

The court agrees that Gianturco's opinions about Koch's behavior are not admissible under Rule 702. Approximately one-third of Gianturco's report is devoted to two sections titled "Timeline of Suspicious Activities by Koch" and "Analysis of Koch Activities." *See* Dkt. 82-3,

---

[8] Woodland also seeks to exclude part of Gianturco's report that opines on emails Cota deleted from her Fiskars's account before she left the company. *See* Dkt. 153, at 13 (discussing Gianturco report ¶¶ 44–45). Fiskars does not address that section of Gianturco's report in its opposition brief, so the court will grant Woodland's motion to exclude that portion of the report as unopposed.

¶¶ 30–40. In this part of his report, Gianturco summarizes evidence related to Koch's employment agreement with Fiskars, details about the emails that Koch sent himself before leaving Fiskars, and Koch's conduct after leaving Fiskars related to Fiskars's data. Gianturco then explains the inferences he draws from Koch's conduct, including his opinion about whether Koch's explanation of his conduct is plausible and his beliefs about Koch's state of mind. These opinions boil down to evaluations of Koch's credibility and his intent, which are tasks reserved for the jury. Because Gianturco's opinions about Koch's behavior do not offer anything based on specialized knowledge that would help the jury assess the evidence in this case, the court will exclude his testimony on this issue.

As for the section of Gianturco's report titled "Fiskars IP and Software Protection," the court concludes that he has not applied a reliable method to the facts of this case to analyze the elements of Fiskars's misappropriation of trade secrets claim. Gianturco's discussion of the source code at issue in this case is brief, so the court can quote it here in full:

> Koch indeed wrote several tools for Fiskars using Python that Fiskars used and is using to automate the process of gathering data from retailers who sell Fiskars products, analyze the sales over time and forecast future needs and trends for Fiskars.
>
> According to Fiskars, what Koch developed for Fiskars was useful to it, including from a business competitive standpoint since it allowed Fiskars to quickly, on a routine basis, collect POS data from multiple retailers and utilize the same to more quickly analyze trends and provide business recommendations to Fiskars for where to focus sales and business efforts.
>
> . . .
>
> Clearly, this type of functionality, including but not limited to assessing current demand, illuminating trends and forecasting future demand is not reasonably known, and is extremely valuable to Fiskars. Fiskars took measures to protect this information that amounted to a defense-in-depth. Fiskars secured the information in place, required credentials to access the information as well as

> access systems needed to generate the information, and restricted
> access to a small subset of people. Only Sales Analytics Team
> members (comprising fewer than 5 people in the entire Fiskars
> organization) had access to the source code. Fiskars did not make
> the features, functionality or capabilities known either generally
> internally or externally at all. Perhaps most importantly with
> respect to this matter, Koch was the primary custodian
> responsible for maintaining knowledge of the tool functionality,
> modifying the code as needed, and executing the code to generate
> reports.

Dkt. 82-3, ¶¶ 26–28, 29. This section of Gianturco's report does nothing more than summarize

the other witnesses' testimony about the value of the Python code and steps that Fiskars took

to protect it. In the pervious section of his report, Gianturco gave a general explanation about

the ways in which software can be valuable intellectual property for a company even if it is

developed from open source programming languages. But he does not provide any analysis of

the actual Python code at issue here to explain its value. Gianturco is permitted to summarize

the relevant evidence that underlies his opinions, but conclusory opinions that merely repeat

evidence from the case without applying reliable principle or methods to analyze it are not

admissible under Rule 702.

The remainder of Gianturco's report contains general information about programming

languages and potential ways that Woodland could have plagiarized Fiskars's intellectual

property. Fiskars contends that this testimony is relevant and admissible expert testimony that

it should be permitted to use to educate the jury. But, for the reasons below, the court will

grant summary judgment to defendants on Fiskars's claim concerning the Python code. So, the

court will deny the remainder of Woodland's motion to exclude Gianturco's testimony as moot.

### 2. Fiskars's claim for misappropriation of trade secrets

Fiskars claims Woodland and Koch misappropriated its trade secrets in violation of

Wisconsin's Uniform Trade Secrets Act, Wis. Stat. § 134.90, and the federal Defend Trade

Secrets Act of 2016, 18 U.S.C. § 1836. The two statutes are similar, and the parties treat the standards governing the federal and state claim the same, so the court will do likewise. There are two basic elements of a claim: (1) the defendant acquired, used, or disclosed the information through improper means; and (2) the information at issue qualifies as a trade secret. 18 U.S.C. § 1639(5); Wis. Stat. § 134.90(2). The second element is dispositive in this case.

To succeed on its trade secret claims, Fiskars must prove that the alleged misappropriated information meets the definition of a trade secret. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002). To be a trade secret, information must meet two statutory criteria: (1) it derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) it is the subject of efforts to maintain its secrecy that are reasonable under the circumstances. 18 U.S.C. § 1839(3); Wis. Stat. § 134.90(c). In addition, plaintiffs must identify the purported trade secret with "a high level of specificity." *REXA, Inc. v. Chester*, 42 F.4th 652, 663 (7th Cir. 2022). Fiskars "must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." *Id.* (quoting *IDX Sys. Corp.*, 285 F.3d at 584). In its opposition brief, Fiskars contends that the defendants misappropriated two types of trade secrets: (1) Python code that Koch developed while working at Fiskars; and (2) Fiskars's "Proprietary Process" for preparing product data. Dkt. 219, at 18, 22. The court will address each of these in turn.

### a.  Python code

Fiskars's trade secret misappropriation claims center on documents that Koch emailed himself prior to leaving Fiskars. The four documents are titled "Menards POS.html," "Database

for Blain's POS.html," "Full Ace Automation.html," and "TV POS Updated Code.html." Each html file contains code that Koch developed using the coding language Python to automate the task of downloading and cleaning up Fiskars sales data from Menards, Blain's Farm and Fleet, Ace Hardware, and True Value. Dkt. 94-2; Dkt. 94-3; Dkt. 94-4. Fiskars asserts that the code in each of these four documents is a trade secret, but it concedes that it cannot claim as trade secrets the open source Python language used to write the code and the raw point-of-sale data from the third-party retailers the code downloaded from their websites. Defendants contend that (1) Fiskars has not identified the alleged trade secrets with sufficient specificity, (2) the Python code is generally known, readily ascertainably, and does not have independent economic value, and (3) Fiskars did not make reasonable efforts to maintain the secrecy of the code.

Fiskars has clearly identified the information it claims as its trade secrets: the 75 pages of code in the html files that Koch emailed to himself in the final three weeks in which he worked at Fiskars. Defendants cite *IDX Systems* to support their contention that Fiskars needed to parse out what specific portions of the code are a trade secret versus basic commands in the public domain. In *IDX Systems* the information plaintiff claimed as its trade secret was "too vague and too inclusive" because plaintiff provided the court with a 43-page description of its software that "effectively assert[ed] that all information in or about its software [was] a trade secret" and would have forced the court to "hunt through the details in search of items meeting the statutory definition" of trade secret. 285 F.3d at 583–84. In contrast to the general description at issue in *IDX Systems*, the compilation of code that Koch developed is identified with sufficient specificity for the court to assess whether it meets the definition of a trade secret. Fiskars is not required to exclude the publicly available Python code packages that Koch used

to develop the final set of code from its alleged trade secret merely because portions of the code are in the public domain. "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001). But to establish that the specific Python code at issue here is a trade secret, Fiskars needs to provide evidence that the combination of code that Koch put together is valuable because it is not generally known or easily duplicated by someone with public knowledge of Fiskars's business. *Computer Care v. Serv. Sys. Enterprises, Inc.*, 982 F.2d 1063, 1075 (7th Cir. 1992).

Fiskars's argument that the Python code is not generally known or readily ascertainable is conclusory. It contends that the Python code could not be generally known or ascertainable through other means because it was Koch's original work, created for Fiskars and never publicly disclosed. Dkt. 21. But this contention fails to address defendants' evidence that Koch used publicly available code to solve a problem that was generally known within Fiskars's business. Fiskars sells its products through retailers who maintain their own point-of-sales data. To perform a comprehensive analysis of sales of its products made by all its retailers, Fiskars must obtain point-of-sale data from individual retailers and then organize the raw data into a standard format. Once Fiskars has the cleaned-up data, it puts it into databases that it uses to analyze it. Prior to Koch, all of Fiskars's sales analysts performed these tasks manually.

Koch created the Python code to automate the manual task of downloading point-of-sale data from third-party retailer's websites and organizing it into a standard, cleaned up format. Dkt. 138 (Tweedy Dep. at 152:7–154:13); Dkt. 89 (Koch Dep. at 67:12–68:2); Dkt. 216-9, at 5. Defendants provide an uncontested expert opinion that the Python code

reflects a series of ordinary data processing steps that are implemented in a simplistic manner using a series of publicly available Python packages. Dkt. 82-2, at ¶¶ 21–27. It is unsurprising that Fiskars does not contest this opinion because common sense dictates that these are the logical steps that a distributor would need to take to be able to analyze third-party sales data. Defendants' expert also opines that the Python code is the type of work product that any junior programmer could generate if asked to create a code to accomplish that task. This uncontested evidence establishes that the purported trade secrets would be readily ascertainable to anyone familiar with Fiskars business and capable of basic programming. In addition, Fiskars provides no evidence to contradict Koch's assertion that ChatGPT could now recreate the Python Code that he put together. There is no genuine dispute that the Python code Koch sent himself is readily ascertainable. Thus, the court concludes that the Koch's Python code scripts do not qualify as trade secrets.

### b. Fiskars's process for preparing product data

Fiskars also contends that the process it uses to analyze third-party retailer point-of-sale data and the output of that process are trade secrets. Dkt. 219, at 22. But Fiskars raises this contention about its purported "Proprietary Process" for the first time in its brief in opposition to defendants' motion for summary judgment. When asked to identify and describe the trade secrets prior to summary judgment, Fiskars responded as follows:

> upon information and belief, informed by Fiskars' investigation to date, Mr. Koch, prior to leaving his employment with Fiskars Brands, Inc., copied highly-sensitive point-of-sales data and proprietary to Fiskars' programming applications and scripts developed using Python code. [FN 1]. In particular, on or around September 7, 2021, September 13, 2021, and September 16, 2021, Mr. Koch accessed Fiskars' protected Point-of-Sales Repository and emailed the point-of-sales data within to his personal email address.

> FN 1. To the extent there is any alleged confusion over the scope of the trade secrets being claimed by Fiskars, they include the programs or scripts developed using Python code, the actual point-of-sales data, and the user names and passwords used to access the data. Fiskars is not claiming the open source Python code programming language itself is a trade secret.

Dkt. 159-2, at 3–4. The "Proprietary Process" Fiskars describes in its brief is not "the programs or scripts developed using Python code, the actual point-of-sales data, [or] the user names and passwords used to access the data."

"[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (internal citation and quotation marks omitted). As this court has explained in a similar context, as a "case progresses, changes to core substantive contentions are increasingly prejudicial to the other side." *Douglas Dynamics, LLC v. Meyer Products LLC*, No. 14-cv-886-jdp, 2017 WL 2116714, at *3 (W.D. Wis. May 15, 2017). The introduction of a new substantive theory of what trade secrets are at issue in opposition to summary judgment is unavoidably prejudicial to defendants.[9] The court will not consider Fiskars's contention that the process it uses to prepare product data is a trade secret.

Because Fiskars failed to show that any of the information that Koch allegedly misappropriated qualifies as a trade secret, the court will grant summary judgment in favor of the defendants on Fiskars's misappropriation of trade secrets claim.

---

[9] Fiskars also contends that the "Product Data" from its proprietary process is a trade secret. But it does not identify any specific product data that it alleges was misappropriated, so the product data cannot be a basis for its trade secret claim.

### 3. Fiskars's breach of contract claims based on its employment agreement

Fiskars originally alleged that the individual defendants—Gundlach, Koch, and Cota—violated three different parts of their employment agreements: the non-compete provision, the non-solicit provision, and the confidentiality provision. Cota and Gundlach moved for summary judgment on Fiskars claims that they violated the employment agreements more than three months before the dispositive motion deadline. In response to that motion, Fiskars abandoned its claims under the non-compete and the non-solicit provisions. *See* Dkt. 91, at 4. So, the only part of the employment agreement still at issue is the confidentiality provision.[10] Woodland and Koch contend that this provision is unenforceable under Wisconsin Statute § 103.465.[11]

Section 103.465 limits the use of restrictive covenants in employment contracts, and the Wisconsin Supreme Court has held that it applies to contract provisions concerning disclosure of an employer's confidential information. *See Heyde Companies, Inc. v. Dove*

---

[10] Woodland asks the court to declare that the non-compete provision of the employment agreement is invalid because Fiskars formally abandoned its claims under that provision. But Fiskars's decision to abandon its breach of contract claims under that provision means that its enforceability is no longer an issue in this case. The court will not rule on an issue that is not before it.

The court will also deny the request in Gundlach and Cota's reply brief that the court issue an order for Fiskars to show cause why its breach of contract claims did not violate Rule 11. If defendants believe that Fiskars's breach of contract claim based on the non-compete provision was frivolous and wish to seek sanctions against Fiskars, they were required to follow the procedures for moving for sanctions in Rule 11.

[11] Gundlach and Cota did not challenge the enforceability of the confidentiality provision in their motion for summary judgment. But their employment agreements contain an identical confidentiality provision as that challenged by the other defendants, so the court's resolution of the other defendants' motion for summary judgment also controls Fiskars's breach of contract claims against Gundlach and Cota based on that provision.

*Healthcare*, LLC, 2002 WI 131, ¶ 13, 258 Wis. 2d 28, 36, 654 N.W.2d 830, 834 (quoting *Tatge v. Chambers & Owen, Inc.*, 219 Wis. 2d 99, 111–12, 579 N.W.2d 217 (1998)). Under § 103.465, a restrictive covenant in an employment contract "is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer." Section 103.465 specifies that "[a]ny covenant . . . imposing an unreasonable restraint is illegal, void and unenforceable even as to any part of the covenant or performance that would be a reasonable restraint." This means that if a non-disclosure provision contains an overbroad definition of confidential information that an employee must keep private, the entire non-disclosure provision is unenforceable, even if the definition also includes information such as trade secrets that an employer could reasonably require employees to keep confidential. "The employer has the burden of proof as to the reasonableness of the non-compete." *Star Direct, Inc. v. Dal Pra*, 2009 WI 76, ¶ 20, 319 Wis. 2d 274, 288, 767 N.W.2d 898, 905.

The employment agreement of each of the three individual defendants contains the same confidentiality provision:

> Confidentiality. Acknowledging that the Employee will, during the course of his/her employment with Fiskars Brands, receive and have access to certain confidential and proprietary information regarding the business and affairs of Fiskars Brands, the Employee shall hold in strict confidence, and shall not disclose or divulge to others, or use to benefit of himself or anyone other than Fiskars Brands, either during the term of this Agreement or following its termination, any information, whether or not in written or printed form, and any things embodying such information, supplied, made available to, or acquired or obtained by the Employee regarding or relating to Confidential Information. "Confidential Information" means any information related to the business of Fiskars Brands that Fiskars Brands does not disclose publicly, including but not limited to information concerning the design, development, manufacturing processes, methods, tools and equipment used in the manufacture or processing of the products or potential products of Fiskars Brands and those of Fiskars Brands' parent company, Fiskars Corporation, and their

44

affiliates, the distribution and marketing of Fiskars Brands' products, the pricing, credit and general sales policies of those entities, any proprietary information of Fiskars Brands, its parent or their affiliates or any other information pertinent to the products or operations of those entities. This Confidentiality obligation shall continue for two (2) years after the end of Employee's employment with Fiskars Brands, except that with respect to any Confidential Information that constitutes a trade secret under applicable law, Employee shall not disclose or use the information for so long as it remains a trade secret. In addition, the Employee acknowledges that Fiskars Brands, its parent and their affiliates are and may be in the future subject to duties to third parties to maintain information in confidence and secrecy. By executing this Agreement, the Employee consents to be bound by any such duty owed by Fiskars Brands, its parent or affiliates to any third party. The Employee further acknowledges that in addition to the foregoing agreements the Employee has a duty to protect Fiskars Brands' trade secrets, the breach of which duty may constitute a criminal offense.

Dkt. 33-2 (Gundlach Agreement); Dkt. 33-3 (Koch Agreement); Dkt. 33-4 (Cota Agreement).

The parties' dispute about the enforceability of the agreement focuses on a few key clauses in this lengthy provision. Woodland and Koch contend that the final catchall category listed in the definition of "confidential information" is so broad that it swallows any reasonable limitations that precede it. With the focus on that clause, the disclosure restriction in the employment agreement boils down to the following: "the Employee . . . shall not disclose or divulge to others, or use to benefit of himself . . . any information . . . supplied, made available to, or acquired or obtained by the Employee regarding or relating to . . . the business of Fiskars Brands that Fiskars Brands does not disclose publicly, including . . . any other information pertinent to the products or operations of [Fiskars Brands, its parent or their affiliates]." Put more simply, Fiskars's employment agreement prohibits employees from disclosing any non-public information regarding Fiskars's operations.

This prohibition is facially overbroad. The final catchall clause in the definition of "confidential information" is so expansive that it necessarily sweeps in information about Fiskars's business that it has no reasonable need to keep confidential. Information about Fiskars's operations that it does not disclose publicly could include many non-sensitive details about the day-to-day operations of the company. For instance, Fiskars may not publicly disclose a work from home policy, that it uses a certain internet provider for its Middleton office, or details about formal company style guidelines for creating slide show presentations. Fiskars offers no explanation for why it must keep confidential all non-public information about its operations.

Indeed, Fiskars does not argue that the overbroad definition of confidential information is reasonably necessary for its protection. Instead, Fiskars contends that the other parts of the confidentiality provision limit the provision to a reasonable scope by specifying that the disclosure restriction applies only to non-public information that the employee actually had access to. But the restriction to non-public information does not cure the overbreadth problem in the definition of confidential information. As discussed above, not all non-public information about the operation of a business is necessarily sensitive information that would compromise the business if made public. And the restriction to information that an employee actually has access to does virtually nothing to limit the scope of the confidentiality provision because an employee cannot disclose information that he does not have access to.

Fiskars also contends that its definition of confidential information is comparable to the definition in a confidentiality provision that the Wisconsin Supreme Court held to be

reasonable in *Star Direct*.[12] *See* Dkt. 219, at 13 (citing *Star Direct*, 2009 WI 76, ¶ 11). The confidentiality provision at issue in *Star Direct* stated that an employee could not "communicate, divulge or disclose for use by himself or any other person . . . any information or knowledge, known, disclosed or otherwise obtained by him during his employment, including" a list of examples of specific types of confidential information. *Star Direct, Inc.*, 2009 WI 76, ¶ 11. The question of contract interpretation presented to the Wisconsin Supreme Court was how to construe the clause that prohibited disclosure of "any information." *Id.*, at ¶ 61. The Wisconsin Supreme Court concluded that, when considered in the totality of the confidentiality provision, the only reasonable construction of the clause was to prohibit the disclosure of the types of confidential information listed in the examples that followed the general disclosure prohibition. *Id.*, at ¶ 63. The court explained that "[a]ll of the enumerated examples of protected information in the confidentiality clause are of a proprietary nature" and reasoned that the language specifying the confidential information in the list of examples would be surplusage if read broadly to mean any information, without limitation. *Id.*

*Star Direct* is consistent with the cannon of textual interpretation that a general term provided after a list of more specific terms should be construed as referring to only the types of things in the preceding list. But neither that general principle nor the reasoning in *Star Direct* applies here because the confidentiality provision begins and ends by prohibiting disclosure of any non-public information about Fiskars's business. This makes it more closely analogous to

---

[12] In response to an argument from Woodland and Koch concerning the reference to "affiliates" in the confidentiality provision, Fiskars cites *Henderson v. U.S. Bank, N.A.*, 615 F. Supp. 2d 804, 813 (E.D. Wis. 2009) as an example of a case where a restrictive covenant that included a reference to "affiliated companies" did not make the covenant unreasonable. But the catchall clause of the confidentiality provision is overbroad regardless of whether it includes operations of Fiskars's affiliates, so the court need not address this argument.

the confidentiality provision in the case *Diamond Assets LLC v. Godina*, 2022 WI App 47, ¶ 58, 404 Wis. 2d 404, 442, 979 N.W.2d 586, 605, than it is to the provision at issue in *Star Direct*. The provision in *Diamond Assets* initially defined confidential information as "all data and information relating to the business and management of the Employer," but then provided a list of defined terms to specify what was included in "information relating to the business and management." *Id.*, at ¶¶ 52, 57. One of those defined terms included "all internal-to-the-business information." *Id.*, at ¶¶ 57–58. The court concluded that, unlike in *Star Direct*, the defined terms did not all fit a pattern of protectible information that limited the broad definition of confidential information. The court explained that a prohibition on sharing all internal-to-the-business information was not reasonably necessary to protect the employer and held that the entire confidentiality provision was unenforceable.

As in *Diamond Assets*, Fiskars's confidentiality provision starts by prohibiting the disclosure of non-public information related to its business, and then says that that prohibition applies to "any other information pertinent to the products or operations of [Fiskars, its parent or their affiliates.]" This is not comparable to *Star Direct*, where the scope of a potentially overbroad definition of confidential information was cabined by a list of examples of confidential information that made it clear that the contract was limited to prohibiting the disclosure of proprietary information.  Like the overbroad clause in *Diamond Assets*, the catchall clause in Fiskars's confidentiality provision would make employes "liable for sharing any detail of [Fiskars's] . . . operations, even the most mundane minutiae." *Id.*, at ¶ 58.

The court concludes that the confidentiality provision's prohibition on disclosing "any information pertinent to the products or operations of [Fiskars Brands]" is reasonably necessary to protect its business. Because the confidentiality provision contains an

48

unreasonable restriction, it is unenforceable under § 103.465. The court will grant summary judgment in favor of Gundlach, Koch, and Cota on Fiskars's breach of contract claims based on the employment agreement.

### 4. Fiskars's breach of contract claim based on Cota's separation agreement

Fiskars brings a second breach of contract claim against Cota based on the post-employment confidentiality obligations in the separation agreement that she signed when she left Fiskars in February 2022. Cota does not challenge the enforceability of the separation agreement. Instead, she contends that Fiskars has not identified any confidential information that Cota used or disclosed in violation of the separation agreement.[13]

Cota's separation agreement sets out the following post-employment obligations concerning Fiskars's confidential information:

> Employee acknowledges and agrees that the customers, business connections, customer lists, strategic plans, vendors and terms of vendor agreements, customer usage and requirements, pricing formulas and methodologies, order quotes and write-up notes, customer and vendor files, methods, procedures, processes, designs, job organization systems, business plans and strategies, existing or proposed bids, bidding strategies, technology, operations, techniques, financial or business projections, investments, marketing plans and strategies, training information and materials, employee compensation and other employee information, customer purchasing history, information generated for customer engagements and other aspects of and information about the business of the Company (the "Confidential

---

[13] In a footnote, Cota contends that the court should dismiss Fiskars's claim under the separation agreement as a matter of law because in its claim for breach of the separation agreement Fiskars concludes by saying, "As a result, upon information and belief, Cota breached the terms of the Cota Fiskars Non-Compete Agreement." Dkt. 33, ¶ 251. The reference to the non-compete agreement appears to be a drafting error on Fiskars's part. It is clear from the rest of this count of Fiskars's amended complaint that Fiskars alleged Cota violated the confidentiality provision of the separation agreement in addition to the confidentiality provision of her employment agreement by using her knowledge of Fiskars's business to help Woodland.

Information") are and/or were established at great expense and protected as confidential information and provide the Company with a substantial competitive advantage in conducting its business. Employee further acknowledges and agrees that by virtue of Employee's employment with the Company, Employee had access to, and was entrusted with, Confidential Information, and that the Company would suffer great loss and injury if Employee would disclose this information or use it in a manner not specifically authorized by the Company. Therefore, Employee agrees that for twenty-four (24) months following Employee's separation from the Company, Employee will not, directly or indirectly, either individually or as an employee, agent, partner, shareholder, owner, trustee, beneficiary, member, manager, co-venturer distributor, consultant or in any other capacity, use or disclose or cause to be used or disclosed, in any geographic area in which, or to any person or entity to which, such use or disclosure could harm the Company's existing or potential business interests, any Confidential Information, unless and to the extent that any such information becomes generally known to and available for use by the public other than as a result of Employee's acts or omissions.

Dkt. 70-1, at ¶ 8. Stated more simply, when Cota left Fiskars, she agreed that for two years after her departure she would not directly or indirectly use or disclose any of Fiskars's confidential information if the disclosure could harm Fiskars's business interests. The agreement defined confidential information defines broadly, including "strategic plans," "vendors and terms of vendor agreements," "business plans and strategies," "financial or business projections," and "marketing plans and strategies."

Fiskars contends that Cota breached her post-employment confidentiality obligations when she began working at Lumino during the two-year period after she left Fiskars because "it would have been unavoidable for Cota to refrain from using Fiskars's Confidential Information while working at Lumino/Woodland Tools." Dkt. 91, at 15. Fiskars's threshold argument in support of this contention is that Lumino and Woodland are the same company. Even if the court were to credit Fiskars's assertion that Lumino and Woodland are functionally

50

the same company, drawing that inference does not mean that Fiskars has met its burden of providing evidence from which a reasonable factfinder could conclude that she used or disclosed confidential information that would harm Fiskars's business interests. Fiskars argues that Cota must have been using her knowledge of Fiskars's confidential business because Woodland was using the Python code that Koch sent himself before leaving Fiskars. But evidence about potential disclosure of Fiskars's confidential information by a different former Fiskars's employee is not sufficient to create a genuine dispute about whether Cota used or disclosed confidential information to Woodland.

The sole evidence that Fiskars cites is an email she sent to Kollman, Gundlach, and Nesvacil in April 2022. Dkt. 91, at 15 (citing Dkt. 94-8). In that email, Cota shares her impressions about people at Fiskars after it publicly disclosed changes to its leadership and her predictions about how the changes will affect Fiskars's business going forward. Dkt. 94-8. But Cota's statements in the email are her own opinions or speculation from after she left Fiskars; they do not qualify as confidential information that Cota was obligated not to share.

Fiskars also contends that Cota violated her separation agreement by retaining confidential documents that she subsequently produced in this litigation. The documents in question are three presentations from September 2017 related to Fiskars's business strategy, that appear to fit the definition of confidential information set out in the separation agreement. Cota provided evidence that her retention of these documents was inadvertent, that she discovered them in the course of searching for documents relevant to this litigation, that she had not accessed or used the files in any way since leaving Fiskars, and that, when she discovered the files, she offered to destroy or discard them but received no response from Fiskars. Cota's offer to destroy the files once she discovered them in her possession is consistent

with the obligations in the separation agreement, and Fiskars has offered no evidence to contradict Cota's declaration that she did not know about, access, or use the documents after she left Fiskars.

As the Seventh Circuit has said, summary judgment is the "put up or shut up" moment in litigation when the parties are required to show that they have sufficient evidence to allow a reasonable jury to find in their favor. *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022). Fiskars has not provided evidence to identify specific confidential information that Cota used or disclosed in violation of her separation agreement, so the court will grant summary judgment to Cota on Fiskars's breach of contract claim against her.

### 5.  Fiskars's breach of duty of loyalty claim against Koch

Fiskars contends that Koch breached his duty of loyalty to Fiskars when he sent himself its source code to use for Woodland. Under Wisconsin law, an employee has a fiduciary duty to an employer if he is an officer of the company, has the equivalent policy making authority as an officer, or is a key employee. *InfoCorp, LLC v. Hunt*, 2010 WI App 3, ¶¶ 16, 27, 323 Wis. 2d 45, 780 N.W.2d 178. An employee is a "key employee" that has a fiduciary relationship with an employer—and therefore owes a duty of loyalty to the employer—if the employee's job responsibilities are of such a nature that they may be used to harm the employer. *Id.*, ¶ 31, 323 Wis. 2d 45, 780 N.W.2d 178. Whether an employee's job responsibilities create a fiduciary relationship is a factual inquiry that must be assessed in the context of the employer's business. *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 42, 294 Wis. 2d 274, 304, 717 N.W.2d 781, 796. A key employee breaches his duty of loyalty if, during the course of employment, he aids a competitor by using his employer's confidential information. *Modern Materials, Inc. v. Advanced Tooling Specialists, Inc.*, 206 Wis. 2d 435, 557 N.W.2d 835, 839 (Ct.

App. 1996). Woodland contends that (1) Koch's role at Fiskars did not meet the definition of a key employee, and that (2) even if Koch did have a fiduciary relationship with Fiskars, he did not breach his duty of loyalty.

The first of these two issues is dispositive. The case law concerning the definition of a key employee is sparse, but several decisions are instructive. In *General Automotive Manufacturing Co. v. Singer*, 19 Wis.2d 528, 120 N.W.2d 659 (1963), the Wisconsin Supreme Court held that a general manager of a machine shop breached his fiduciary duty by secretly creating his own business and diverting some of the orders that the machine shop received for his own private interest. The court reasoned that the defendant owed his employer a fiduciary duty because he was acting as the machine shop's agent when dealing with a third party trying to place manufacturing orders. *Id.*, at 534. Similarly, in *Burg v. Miniature Precision Components, Inc.*, 111 Wis. 2d 1, 330 N.W.2d 192 (1983), a non-officer employee owed his employer a fiduciary duty because he was able to use his position to divert company money to himself. The employee was a manager for a department that molded plastic parts, with responsibility for in-house production and authority to outsource production to outside vendors. *Id.*, at 9–10. He breached his duty of loyalty by secretly starting a company that produced plastic parts and hiring it as an outside vendor on behalf of his employer. *Id.*

In contrast, in *Modern Materials*, the court held that the defendant employee's duties did not rise to the level of authority to create a fiduciary duty. 206 Wis. 2d at 445. The employee was a plant manager who had responsibility for day-to-day operations that included hiring and firing other employees and purchasing equipment, but the undisputed evidence showed that he never exercised that authority without consulting the owner of the company. *Id.*, at 445. Even though the employee explored starting a competitive business while working

at the company, this was not a breach of fiduciary duty because "an agent may 'plan and develop his competitive enterprise during the course of his agency provided the particular activity engaged in is not against the best interests of [the] principal.'" *Id.*, at 447 (quoting *Standard Brands, Inc. v. United States Partition & Packaging Corp.,* 199 F. Supp. 161, 172 (E.D. Wis. 1961)).

The common feature of the job responsibilities in the cases where the defendant was a "key employee" is that the employees' roles gave them the ability to act on behalf of the company. Because the employees had roles in which they represented their employers, they had a fiduciary duty to the employer while acting in that capacity. This is analogous to traditional fiduciary relationships such as a trustee or an officer of a corporation where a representative is acting on behalf of an entity or person and has a duty of loyalty to act in the best interest of that entity or person rather than for the representative's personal interest. The court concludes that Fiskars has not provided evidence from which a reasonable jury could find that Koch's access to confidential sales data and analytics put him in a position to harm Fiskars by exploiting his job responsibilities to benefit a competitor.

Fiskars contends that Koch was a key employee because he was the only person to develop the Python code. But, as discussed above, the Python code that Koch developed was simply a tool to automate the manual process other sales analysts were already performing. There is no dispute that Koch was the lone sales analyst who developed the Python code, but the evidence also shows that programming was not part of Koch's job description and that he developed the code on his own initiative. Koch did have access to confidential sales data and analysis, but his access was no different than all the other sales analysts who worked for Fiskars. If merely having access to confidential information was sufficient for someone to qualify as a

key employee, then every entry-level employee at Fiskars with access to sales or marketing data would qualify as a key employee. But Fiskars has not provided any evidence that the information accessible to every employee in its analytics department was so sensitive that they could use their job responsibilities to harm Fiskars. Because Fiskars has not provided evidence that would lead a reasonable jury to conclude that Koch was a key employee, the court will grant his motion for summary judgment on Fiskars's breach of loyalty claim.

### 6. Tortious interference

Both Fiskars and Woodland bring claims for tortious interference. Under Wisconsin law, a claim for tortious inference has the following five elements: (1) the plaintiffs had a contract or prospective contractual relationship with a third party; (2) defendants interfered with that relationship; (3) the interference was intentional; (4) there is a causal connection between the interference and plaintiffs' damages; and (5) the interference was improper. *Briesemeister v. Lehner*, 2006 WI App 140, ¶ 48, 295 Wis. 2d 429, 720 N.W.2d 531. The party bringing a tortious interference claim must prove the first four elements, but the party accused of tortious interference has the burden of proving that its interference was justified. *Id.*, ¶ 51.

### a. Fiskars's claim against Woodland and Lumino

Fiskars contends that Woodland and Lumino tortiously interfered with Fiskars's contractual relationships with Gundlach, Koch, and Cota by encouraging them to disclose Fiskars's confidential information in violation of the confidentiality provisions of the contracts each of the former employees had with Fiskars.

Because the court has concluded that the confidentiality provision of the employment agreement is unenforceable, Fiskars cannot establish the first element of its tortious interference claim based on that agreement. And because Fiskars has not provided sufficient

evidence for a reasonable factfinder to conclude that Cota used or disclosed any of Fiskars's confidential information while working at Lumino, Fiskars cannot establish the second element of its tortious interference claim based on Cota's separation agreement. The court will grant summary judgment to defendants on Fiskars's tortious interference claim.

**b. Woodland's claim against Fiskars**

Woodland brings a claim against Fiskars for tortious interference based on letters that Fiskars sent to three of Woodland's suppliers demanding that they stop manufacturing products for Woodland. Fiskars does not dispute that it sent letters to the three suppliers, both before and after starting this litigation. But Fiskars contends that it was justified in sending the letters because it was enforcing its own contractual rights with the suppliers and that this claim is preempted by federal law that protects Fiskars's assertion of its patent rights.[14] The letters that Fiskars sent the suppliers before it brought this litigation focus on Fiskars's contracts with the three suppliers without identifying any specific intellectual property, but the letters it sent after the litigation focus on Fiskars's patent infringement claims. Because the court's analysis will depend on the content of the letters, the court will first address Fiskars arguments concerning state law for the pre-litigation letters and then address Fiskars's federal preemption argument for the post-litigation letters.

"To determine whether conduct is justified or privileged" under Wisconsin law, courts consider the following factors: "the nature, type, duration and timing of the conduct, whether

---

[14] Fiskars also contends that Woodland cannot show that it had sufficiently concrete relationships with the suppliers to bring a tortious interference claim because it did not have written supply agreements and that Woodland has not offered sufficient evidence to show that Fiskars's letters caused it any harm. The court need not address the parties' dispute about these elements because the court will grant summary judgment to Fiskars on other grounds.

the interference is driven by an improper motive or self-interest, and whether the conduct, even though intentional, was fair and reasonable under the circumstances." *Briesemeister*, 2006 WI App 140, ¶ 51. "A party has a right to protect what he believes to be his legal interest." *Id.*, ¶ 54. Actions taken in good faith to protect a party's contractual rights are considered a justification for conduct that would otherwise qualify as tortious interference. *See Sparks v. Waukesha Bearings Corp.*, 145 Wis. 2d 896, 428 N.W.2d 561 (Ct. App. 1988) (holding that defendant's good faith belief that it had an enforceable non-compete agreement with the plaintiff was a complete defense to plaintiff's claim for tortious interference). This principle applies even if the party's belief about the scope of its legal right is ultimately determined to be incorrect in subsequent litigation. *Briesemeister*, 2006 WI App 140, ¶ 54.

Fiskars corresponded with each of the three suppliers about Woodland on three occasions. First, on July 27, 2022, Fiskars sent a letter from its in-house legal counsel, Anza D'Antonio, which said that Fiskars was concerned that the supplier was violating its "Supply Agreement" with Fiskars and contributing to Woodland's theft of Fiskars's intellectual property. Dkt. 167-9; Dkt. 167-10; Dkt. 167-11. Fiskars also demanded that the supplier stop supplying Woodland with products that violate the Supply Agreement and provide Fiskars with copies of the supplier's agreement with Woodland. *Id.* Second, on August 3, 2022, D'Antonio sent follow-up emails to each of the suppliers that said that "any garden tools that [the supplier] may be supplying to Woodland" could violate the Supply Agreement and repeated Fiskars's demand for copies of agreements between the supplier and Woodland. Dkt. 208-18; Dkt. 208-19; Dkt. 208-20. Third, in October 2022, Fiskars sent a letter from a different member of its in-house legal team, Sami Kylmanen, that informed the suppliers that Fiskars had filed its complaint in this case, identified the patents at issue in the litigation, and

demanded that the supplier stop manufacturing the accused products. Dkt. 167-13; Dkt. 167-14; Dkt. 167-15.

On its face, the correspondence that Fiskars sent the suppliers prior to filing its lawsuit seeks to protect Fiskars's contractual rights under its Supply Agreements. The Supply Agreements that Fiskars executed with each of the suppliers are identical in all relevant parts. Section 15.7 of each agreement contains the following provision:

> Seller shall not have any right to manufacture, sell and/or license the Products, Improvements or products which could reasonably be interpreted to be competing with the Products or improvements to third parties, or otherwise utilize the Buyer's design or other technical information provided by the Buyer without the prior written consent of the Buyer. For the avoidance of doubt, Seller shall not replicate or reverse engineer any of Buyer's design or technical information provided by the Buyer.

Dkt. 167-3; Dkt. 167-4; Dkt. 167-5. This provision is not a model of clarity, but the restrictions that it places on the suppliers are unambiguous. The "Seller," meaning each of the three supplier companies, may not manufacture or sell products that "could reasonably be interpreted to be competing with" the products the supplier manufacturers for Fiskars. Fiskars's correspondence explicitly invokes this provision to demand that the suppliers stop selling Woodland products that compete with the Fiskars products identified in the Supply Agreement.

Woodland does not dispute that the Supply Agreements prohibit the suppliers from manufacturing products that compete with the products made for Fiskars or that Fiskars believed that Woodland's products could reasonably be interpreted as competing with Fiskars's products. Indeed, Woodland argues that Fiskars sent the letters with the improper motive of eliminating a business competitor *because* it thought Woodland's products were competition for Fiskars's garden tools. *See, e.g.*, Dkt. 205, at 22. Simply put, Fiskars believed Woodland's

products were competing with Fiskars's products, so it was justified in sending the suppliers letters to assert its contractual rights.

Woodland contends that Fiskars's correspondence invoking the Supply Agreements was not fair and reasonable under the circumstances because Fiskars has not sent the suppliers letters about other competitors, even though the suppliers sell garden tools to other Fiskars competitors, and because the July and August correspondence did not identify which of Fiskars's products or intellectual property Fiskars believed Woodland's products were competing with.[15] Woodland argues that Fiskars's failure to identify specific products shows that it was not asserting its contractual rights in good faith and was instead seeking to eliminate a competitor through improper threats. Both of these facts support the reasonable inference that Fiskars was specially concerned about the competitive threat that Woodland posed and that it sent the letters to the suppliers to address that threat without doing all the diligence that it could have to determine if the suppliers were actually manufacturing products in violation of the Supply Agreements. But a competitive motive alone is not sufficient to establish bath faith, *Pure Milk Prod. Co-op. v. Nat'l Farmers Org.*, 64 Wis. 2d 241, 260, 219 N.W.2d 564, 574 (1974), and Fiskars did not need to conclusively determine whether the suppliers were violating the agreements before seeking to assert its contractual rights,

---

[15] Woodland also raises issues of contract interpretation about which Fiskars entity has the right to enforce Fiskars's Supply Agreements and about whether the Supply Agreement with one of the suppliers (Jumbo) is enforceable against the specific supplier entity that Woodland was working with. But even if Woodland is correct on both points, a party can be justified in asserting what it believes to be its legal right even if it is later determined that the party was incorrect about the scope of its rights. *Briesemeister*, 2006 WI App 140, ¶ 54. Fiskars offers plausible arguments about why Fiskars Brands has a right to enforce the contract, and why the contract is enforceable against the Jumbo entity that received the letter. So it has shown that, at a minimum, it was asserting what it believed in good faith to be its legal rights.

*Briesemeister*, 2006 WI App 140, ¶ 54. Because Fiskars had the right to demand that the suppliers comply with the terms of § 15.7 of the Supply Agreements, it was justified in sending the suppliers letters on July 27 and emails on August 3.

As for the October post-filing letters, Fiskars was communicating with the suppliers about its patent rights that it asserted in this case. Fiskars identifies the patents that it accused Woodland of infringing as well as the specific accused products that the supplier manufactured for Woodland that Fiskars wanted the supplier to stop making. Dkt. 167-13; Dkt. 167-14; Dkt. 167-15. Federal patent law preempts claims based on a patentholder's good-faith communications asserting infringement of its patents. *Lite-Netics, LLC v. Nu Tsai Capital LLC*, 60 F.4th 1335, 1343 (Fed. Cir. 2023). There is a presumption "that the assertion of a duly granted patent is made in good faith." *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1371 (Fed. Cir. 2002) (quoting *C.R. Bard Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998)). As the party bringing the tortious interference claim challenging Fiskars's statements about its patents, Woodland has the burden of providing clear and convincing evidence that Fiskars's infringement claims in the letters it sent the suppliers were objectively baseless. *SSI Techs., LLC v. Dongguan Zhengyang Elec. Mech. LTD.*, 59 F.4th 1328, 1337 (Fed. Cir. 2023). Infringement allegations are objectively baseless if "no reasonable litigant could reasonably expect success on the merits." *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1260 (Fed. Cir. 2008) (quoting *GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1374 (Fed. Cir. 2007)).

Woodland has failed to adduce evidence of objective baselessness. As for the allegations concerning the two patents that Fiskars withdrew once the litigation was underway, Woodland submits untimely supplemental expert declarations to assert that the accused products are plainly dissimilar from the design patents. Dkt. 209; Dkt. 210. The court will not consider

Woodland's untimely expert opinions about the withdrawn design patent claims, so the only evidence that Woodland offers of the objective baselessness of those claims is a visual comparison of the design patent, accused product, and prior art. As for the two design patents that remained in the case, Woodland relies on the same arguments in support of its motion for summary judgment on Fiskars's patent infringement claims to contend that no reasonable litigant could conclude that the claims concerning the '969 and '828 patents have merit. The court will grant summary judgment in favor of Woodland on those claims, but "[a]n incorrect allegation of patent infringement is not necessarily objectively baseless." *Lite-Netics, LLC*, 60 F.4th at 1344. Each of the accused products has similarities to the corresponding design patent. Because of these general similarities, the court cannot say that the claims were so baseless that no reasonable litigant could realistically expect favorable relief.

In sum, Fiskars has shown that it was properly exercising its legal rights when it sent the letters to the suppliers. The court will grant summary judgment in favor of Fiskars on Woodland's counterclaim for tortious interference.

## C. Woodland's motion to exclude testimony from Andrew Smith

Fiskars retained Andrew Smith as a rebuttal expert on the issues raised in Woodland's false advertising claims. But after the deadline for rebuttal expert reports passed and the court denied Fiskars's motion to allow supplementation of rebuttal expert reports, Fiskars informed defendants that Smith would not be providing any expert opinion, "absent further order of the Court." Dkt. 156-2, at 2. Woodland contends that Fiskars's qualified statement implies that it will attempt to supplement Smith's declaration, and it moves to exclude any testimony from Smith because Fiskars has not withdrawn his declaration.

There is no live dispute here for the court to decide. Smith's declaration contains no expert opinions, and Fiskars has said that Smith will not be offering any such opinions. Nor could he, because the deadline for disclosure of liability expert opinions has long since passed. The court will deny Woodland's motion as moot.


CONCLUSION

On the evidentiary issues, the court is granting Woodland's motion to exclude opinions and testimony from Visser and is granting in part Woodland's motion to strike Cunningham's declaration to exclude his testimony related to the cutting power of Fiskars's tools. The court is also granting in part the motion by all defendants to exclude opinions and testimony from Gianturco related to Koch's conduct and the value of the Python code Koch sent himself. The court is denying as moot the remainder of defendants' motions to exclude or strike testimony.

The court is granting summary judgment to defendants on all of Fiskars's claims. The court is granting summary judgment to Fiskars's on most of Woodland's counterclaims. The exception, for which summary judgment is denied, is Woodland's counterclaim for false advertising based on: Fiskars's cutting power statements; and the designed in USA statements about the 9117 pruners, the 9109 pruners, the 9688 pruners, the 7936 pruners, and the 9189 hedge shears.


ORDER

IT IS ORDERED that:

1.  The motion for summary judgment by defendants Ross Gundlach and Stephanie Cota, Dkt.  67, is GRANTED.

2.  Defendant Woodland Tools Inc.'s motion to exclude opinions and testimony of Steven Visser, Dkt. 150, is GRANTED.

3.  Defendants' motion to exclude opinions and testimony of Mark Gianturco, Dkt. 152, is GRANTED in part. Any testimony from Gianturco concerning the opinions in paragraphs 22 to 40 and 44 to 45 of his report are excluded. The motion is otherwise DENIED as moot.

4.  Defendant Woodland Tools Inc.'s motion to exclude opinions and testimony of Andrew Smith, Dkt. 154, is DENIED as moot.

5.  The motion for summary judgment by defendants Vance Koch, Lumino, Inc., and Woodland Tools Inc., Dkt. 157, is GRANTED.

6.  The motion for summary judgment by plaintiffs Fiskars Brands Inc. and Fiskars Finland Oy Ab, Dkt. 165, is GRANTED in part as follows:

    a.  Plaintiffs are entitled to summary judgment on Woodland's counterclaim for tortious interference;

    b.  Plaintiffs are entitled to summary judgment on Woodland's counterclaim for false advertising concerning statements about the design origin of Fiskars's 9286 hedge shears;

    c.  Plaintiffs are entitled to summary judgment on Woodland's counterclaim for false advertising concerning statements about Fiskars's titanium blade coating and the cutting power of Fiskars's 9132 lopper;

    d.  Plaintiffs' motion for partial summary judgment is otherwise DENIED.

7.  Defendant Woodland Tools Inc.'s motion to strike the declaration of Daniel Cunningham, Dkt. 194, is GRANTED in part. The court strikes paragraphs 9 to 17 of Cunningham's declaration. The motion is otherwise DENIED.

Entered August 26, 2024.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge